**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **VDPP, LLC,** | |
| **Plaintiff,** | **Civil Action No. 1:26-cv-00903-MHC** |
| **v.** | |
| **INTUITIVE SURGICAL, INC.,** | **JURY TRIAL DEMANDED** |
| **Defendant** | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

1. Plaintiff VDPP, LLC ("VDPP") files this First Amended Complaint and demand for jury trial seeking relief from infringement of the claims of U.S. Patent No. 9,699,444 (the "'444 patent") and U.S. Patent No. 9,716,874 (the "'874 patent") (collectively, the "Patents-in-Suit") by Defendant Intuitive Surgical, Inc. ("Intuitive" or "Defendant").

**I. THE PARTIES**

2. VDPP is a company organized under the laws of Oregon with a principal place of business located in Corvallis, Oregon.

3. On information and belief, Defendant is a corporation organized and existing under the laws of the State of Delaware, with a headquarters and a regular and established place of business in this District at 5655 Spalding Drive, Peachtree Corners, Georgia 30092. Defendant has been served.

4. On information and belief, Defendant sells, offers to sell, supports, installs, maintains, and/or uses products and services throughout Georgia, including in this judicial district, and introduces products and services that perform infringing methods or processes into the stream of

commerce knowing that they would be sold, used, and/or supported in Georgia and this judicial district.

## II. JURISDICTION AND VENUE

5. This Court has original subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because VDPP's claims arise under the patent laws of the United States, including 35 U.S.C. § 271.

6. This Court has personal jurisdiction over Defendant because, on information and belief, Defendant is present within and has minimum contacts within the State of Georgia and this District, has purposefully availed itself of the privileges of conducting business in Georgia and this District, and VDPP's causes of action arise directly from Defendant's business contacts and activities in Georgia and this District.

7. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1400(b). On information and belief, Defendant has committed acts of infringement in this District and has a regular and established place of business in this District. Venue is further proper because Defendant conducts substantial business in this forum, directly and/or through intermediaries, including at least a portion of the infringements alleged herein, regularly doing or soliciting business, engaging in persistent courses of conduct, and deriving substantial revenue from goods and services provided to individuals and entities in Georgia and this District.

## III. INFRINGEMENT

### A.    Infringement of the '444 Patent

8. On July 4, 2017, U.S. Patent No. 9,699,444, entitled "Faster state transitioning for continuous adjustable 3deeps filter spectacles using multi-layered variable tint materials," was duly and legally issued by the United States Patent and Trademark Office. A copy of the '444

2

patent is attached as Exhibit A and incorporated by reference. VDPP owns the '444 patent by assignment.

9. The '444 patent relates to specific systems and methods for video and image-frame processing, including storing one or more image frames, obtaining a first image frame from a video stream, modifying that image frame, generating a visually distinct bridge frame, blending the modified image frame with the bridge frame, and displaying the resulting blended modified image frame. The specification describes, for example, the use of a bridge picture that is substantially dissimilar from substantially similar image pictures to create the appearance of continuous, seamless, and sustained directional movement. *See* '444 patent at 4:36-48 and 4:59-62; *see also* Figs. 23-29. The specification also describes blending image pictures with each other and with a bridging picture to produce blended frames. *See* '444 patent at 5:10-16 and Figs. 24A-24C, 29A-29C.

10. The asserted '444 claims are technological and concrete. They do not merely recite a desired result, such as showing an image or presenting information. Instead, they recite particular image-processing components and a specific sequence of operations: storage for one or more image frames; a processor that obtains a first image frame from a first video stream; removal of a portion of that image frame to generate a modified image frame different from the first image frame; generation of a bridge frame that is non-solid color and different from both the first image frame and the modified image frame; blending of the modified image frame with the bridge frame; and display of the blended modified image frame. Those requirements tie the claims to how video-image data is obtained, altered, blended, and displayed, and they limit the claims to a particular technological implementation rather than to the broad concept of collecting or displaying information.

11. The '444 patent's drawings and written description further show the particular technological implementation and improvements claimed. Figure 3 shows a signal receiving unit, control unit, power unit, and left and right lenses; Figure 4 illustrates processing modules including "Read & Store 3Deeps Signal," "Store and Manage 3Deeps Signal," and "Parse and Store Left and Right OD," which the specification discusses at 6:39-42; and Figures 9 and 10 show transmission-time relationships and a faster transition path. Figures 23 through 29 illustrate individual image pictures, bridge pictures, series, repeating series, and blended pictures. The specification explains that a bridge picture is inserted between substantially similar pictures to create the appearance of continuous, seamless, and sustained directional movement, *see* '444 patent at 4:36-48 and 4:59-62, and that image pictures may be blended with each other and with a bridge picture to produce blended frames, *see id.* at 5:10-16 and Figs. 24A-24C, 29A-29C. The patent also explains that image frames may be single-frame photographs from a movie showing movement, *see id.* at 38:42-45, and that shrinking or enlargement of areas relative to matched areas creates a zooming-in or zooming-out effect, *see id.* at 41:58-62. These disclosures support that the asserted '444 claims address video-frame and display-generation problems through specific frame transformations and bridge-frame blending, not through generic computer activity.

12. On information and belief, Defendant has directly infringed one or more claims of the '444 patent, including at least the exemplary asserted claim charted in Exhibit B, literally and/or under the doctrine of equivalents, by making, using, selling, offering to sell, and/or importing systems and services including Intuitive's da Vinci Xi Surgical System and related image-capture, image-processing, storage, overlay, and display functionality (the "Accused '444 Instrumentalities"). Defendant put the claimed invention into service and obtained beneficial use from the claimed system and its image-processing and display capabilities.

4

13. Exhibit B provides preliminary exemplary infringement contentions for the '444 patent. Exhibit B identifies the Accused '444 Instrumentalities as Intuitive's da Vinci Xi Surgical System, including the surgeon console, patient cart, and vision cart that together provide real-time visualization and processing of surgical video and display visual content such as endoscopic/surgical images, graphical overlays, and system interface elements. *See* Ex. B at pp. 2-3.

14. As set forth in Exhibit B, the da Vinci Xi system includes storage adapted to store image frames. The chart identifies the system's USB flash drive as storage and explains that the system's video processor processes endoscopic/surgical video and records still images to the USB flash drive. *See* Ex. B at p. 4. The chart further identifies the video processor as a processor adapted to obtain a first image frame from a first video stream, explaining that the system receives endoscopic/surgical video comprising a sequence of original still images and processes that video using a video processor. *See* Ex. B at p. 5.

15. Exhibit B further alleges that the da Vinci Xi system removes a portion of a first image frame to generate a modified image frame. The chart explains that the system processes endoscopic/surgical video and modifies still images using operations such as zooming and display adjustments; by applying digital zoom, the system crops or removes portions of the original still image and generates a modified still image for display. *See* Ex. B at p. 6. The chart also shows that the modified image frame is different from the first image frame because the system applies adjustments such as color balance and zoom, thereby altering the visual content of the original still image. *See* Ex. B at p. 6.

16. Exhibit B also alleges that the da Vinci Xi system generates a non-solid-color bridge frame. Specifically, the chart identifies graphical overlay elements, including menus, status

indicators, GUI tabs, and telestration markings, as a bridge frame rendered in multiple colors and displayed on or alongside the endoscopic/surgical image. *See* Ex. B at pp. 7-8. Exhibit B further alleges that these graphical overlay elements are different from the first image frame and the modified image frame because they comprise menus, tabs, icons, text, status indicators, and annotations, while the first and modified still images comprise endoscopic/surgical image data. *See* Ex. B at pp. 9-10.

17. Exhibit B further alleges that the da Vinci Xi system blends the modified image frame with the bridge frame to generate a blended modified image frame and displays the result. The chart explains that the system renders menus, tabs, status indicators, and telestration markings over the endoscopic/surgical image such that both the image and graphical elements appear together on the display, thereby blending the modified still image with the graphical overlay elements to generate a blended modified still image. *See* Ex. B at pp. 11-12. Exhibit B further alleges that the blended modified image frame is displayed on the system's on-screen display. *See* Ex. B at pp. 13-14.

18. VDPP's infringement allegations are preliminary and are based on publicly available information and VDPP's current investigation. Discovery is expected to reveal additional evidence regarding Defendant's design, operation, use, testing, sales, support, and internal documentation for the Accused '444 Instrumentalities, including the image-processing, storage, overlay-generation, blending, and display functionality alleged herein.

19. Defendant has caused Plaintiff damage by direct infringement of the claims of the '444 patent.

**B.   Infringement of the '874 Patent**

20. On July 25, 2017, U.S. Patent No. 9,716,874, entitled "Continuous Adjustable 3Deeps Filter Spectacles for Optimized 3Deeps Stereoscopic Viewing, Control Method and Means therefore, and System and Method of Generating and Displaying a Modified Video," was duly and legally issued by the United States Patent and Trademark Office. A copy of the '874 patent is attached as Exhibit C and incorporated by reference. VDPP owns the '874 patent by assignment.

21. The '874 patent is directed to specific methods and systems for generating and displaying modified video. The patent describes acquiring a source video comprising a sequence of 2D image frames, obtaining image frames from that source video, calculating parameters such as lateral speed and direction of motion using motion vectors, generating a deformation value using those parameters, applying the deformation value to identify a modified image frame, and blending the modified image frame with a bridge frame to generate a blended frame. *See* '874 patent at 8:47-65; *see also* Figs. 42A-42B. The patent also states that in another embodiment the blended frame is displayed to a viewer. *See id.* at 9:9-10.

22. The asserted '874 claims are likewise technological and concrete. Claim 1, for example, does not merely claim the goal of displaying modified video. It recites a defined method for generating and displaying modified video through particular image-frame operations: acquiring a source video comprising a sequence of image frames; obtaining a selected first image frame; generating a modified image frame by expanding the first image frame, removing a portion of the first image frame, or stitching the first image frame with a portion of a second image frame; generating altered image frames that include specified non-overlapping portions; and requiring that certain non-overlapping portions are not included in the first image frame or modified image frame. These requirements limit the claim to a particular way of constructing altered frames from

selected portions of video image frames, and they require concrete changes to video-frame content rather than a generalized instruction to organize or display information.

23. The '874 patent's figures and specification confirm that the asserted claims are rooted in video-display technology and identify a particular technical implementation. Figure 36 shows a video display manager with a processor, bridge-frame generator, storage, video file, and frame-display module. Figure 37 illustrates receiving data comprising an image frame, generating visually dissimilar bridge frames, blending the image frame with bridge frames to generate blended frames, and displaying the blended frames. Figures 38 through 40D show image frames, bridge frames, blended frames, non-overlapping portions, and repeating display patterns. Figure 41 shows a computer having processor, storage, memory, network interface, and input/output devices. Figures 42A and 42B show a method for acquiring a source video, obtaining an image frame with motion vectors, calculating lateral speed and direction-of-motion parameters, generating and applying a deformation value, blending modified image frames with first and second bridge frames, and displaying blended frames. *See* '874 patent, Figs. 36-42; *see* also id. at 69:40-60, 70:42-65, and 71:1-14. These disclosures show that the asserted '874 claims claim a specific video-frame generation and display technique, including particular frame portions, bridge frames, blended frames, and displayed altered frames, rather than a generic computer implementation of an abstract result.

24. On information and belief, Defendant has directly infringed one or more claims of the '874 patent, including at least claim 1 as charted in Exhibit D, literally and/or under the doctrine of equivalents, by making, using, selling, offering to sell, and/or importing systems and services including Intuitive's da Vinci Xi Surgical System and related image-capture, image-processing, tile/multi-image display, overlay, and display functionality (the "Accused '874 Instrumentalities").

Defendant put the claimed method into service and obtained beneficial use from the claimed video-generation and display functions.

25. Exhibit D provides preliminary exemplary infringement contentions for the '874 patent. Exhibit D alleges that Intuitive's da Vinci Xi Surgical System performs a method for generating and displaying modified video because the system captures endoscopic/surgical video, processes and modifies still images using image-processing operations such as zooming and display adjustments, generates graphical overlay elements such as menus, status indicators, and telestration markings, and displays the modified video on an on-screen display. *See* Ex. D at pp. 2-4.

26. Exhibit D alleges that the da Vinci Xi system acquires a source video comprising a sequence of image frames by capturing endoscopic/surgical video of the surgical field and receiving it as a continuous stream of still images. *See* Ex. D at p. 5. Exhibit D further alleges that the system obtains a first image frame based on a selected one of the image frames of the source video by processing the endoscopic/surgical video and selecting one still image from the video stream for use as an original still image. *See* Ex. D at p. 6.

27. Exhibit D further alleges that the da Vinci Xi system generates a modified image frame by stitching together the first image frame with a second portion of a second image frame. The chart identifies tiled or multi-image display modes, including TilePro, as combining or presenting multiple image regions or sources within a single display, thereby generating a composite image. *See* Ex. D at pp. 6-7.

28. Exhibit D alleges that the da Vinci Xi system generates a first altered image frame that includes first and second non-overlapping portions by using TilePro or other multi-image display modes to present multiple image sources simultaneously in separate regions of the display. The

chart explains that the system uses the original still image to form a first portion and uses a portion of a second still image to form a second portion, positions these portions in separate display regions, and thereby generates a first altered image frame with non-overlapping portions. *See* Ex. D at p. 7. The chart further alleges that the first non-overlapping portion comprises a selected portion of the modified image frame. *See* Ex. D at p. 8.

29. Exhibit D also demonstrates that the first image frame and the modified image frame do not include the second non-overlapping portion. The chart explains that the system captures individual still images from the endoscopic/surgical video feed, that each still image corresponds to a separate frame, and that the second non-overlapping portion is derived from a different still image rather than the original first image frame or the modified image frame. *See* Ex. D at pp. 9-11.

30. Exhibit D further shows that the da Vinci Xi system generates a second altered image frame that includes third and fourth non-overlapping portions by forming distinct portions from image data and combining them into a single image. The chart alleges that the third non-overlapping portion comprises a second selected portion of the modified image frame different from the first selected portion and that the first image frame and the modified image frame do not include the fourth non-overlapping portion because the fourth non-overlapping portion is derived from separate image data. *See* Ex. D at pp. 11-15.

31. VDPP's infringement allegations are preliminary and are based on publicly available information and VDPP's current investigation. Discovery is expected to reveal additional evidence regarding Defendant's design, operation, use, testing, sales, support, and internal documentation for the Accused '874 Instrumentalities, including the video-stream acquisition, frame selection,

10

modified-frame generation, tile or multi-image display, non-overlapping portions, and display functionality alleged herein.

32. Defendant has caused Plaintiff damage by direct infringement of the claims of the '874 patent.

## IV. CONDITIONS PRECEDENT

33. VDPP is a non-practicing entity, with no products to mark. VDPP has pled all statutory requirements to obtain pre-suit damages. Further, all conditions precedent to recovery are met. Under the rule-of-reason analysis, VDPP has taken reasonable steps to ensure marking by any licensee producing a patented article.

34. VDPP and its predecessors-in-interest have entered into settlement licenses with several defendant entities, but none of the settlement licenses were to produce a patented article for or under VDPP's patents. Duties of confidentiality prevent disclosure of settlement licenses and their terms in this pleading, but discovery will show that VDPP and its predecessors-in-interest have substantially complied with Section 287(a). Furthermore, each of the defendant entities in the settlement licenses did not agree that it was infringing any of VDPP's patents, including the Patents-in-Suit, and thus was not entering into the settlement license to produce a patented article for VDPP or under its patents. Further, to the extent necessary, VDPP will limit its claims of infringement to method claims and thereby remove any requirement for marking.

35. To the extent Defendant identifies an alleged unmarked product produced for VDPP or under VDPP's patents, VDPP will develop evidence in discovery to show that the alleged unmarked product does not practice the Patents-in-Suit and/or that VDPP has substantially complied with the marking statute. Defendant has not identified any alleged patented article for which Section 287(a) would apply.

36. The policy of § 287 serves three related purposes: (1) helping to avoid innocent infringement; (2) encouraging patentees to give public notice that an article is patented; and (3) aiding the public in identifying whether an article is patented. These policy considerations are advanced when parties are allowed to settle cases without admitting infringement and without creating an obligation to mark products that the licensee denies are patented articles. All settlement licenses were entered to end litigation, and the policies of § 287 are not violated. Such a result is further warranted by 35 U.S.C. § 286, which allows for the recovery of damages for six years prior to the filing of the complaint.

37. For each previous settlement license, VDPP understood that: (1) the settlement license was entered to end litigation and was not a license under which the defendant entity sought to sell a product under any of VDPP's patents; (2) the settlement license was entered into to terminate litigation and prevent future litigation between VDPP and the defendant entity for patent infringement; (3) the defendant entity did not believe it produced any product that could be considered a patented article under 35 U.S.C. § 287; and (4) VDPP believes it has taken reasonable steps to ensure compliance with 35 U.S.C. § 287 for each prior settlement license.

38. Each settlement license entered into between a defendant entity and VDPP was negotiated in the face of continued litigation. While VDPP believed there was infringement, no defendant entity agreed that it was infringing. Thus, each prior settlement license reflected a desire to end litigation and does not implicate the policies of § 287 in a manner that would preclude VDPP's damages claims.

## V. JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable by right.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a. enter judgment that Defendant has infringed one or more claims of each of the Patents-in-Suit;

b. award Plaintiff damages in an amount sufficient to compensate it for Defendant's infringement of the Patents-in-Suit, in an amount no less than a reasonable royalty or lost profits, together with pre-judgment and post-judgment interest and costs under 35 U.S.C. § 284;

c. award Plaintiff an accounting for acts of infringement not presented at trial and an award by the Court of additional damages for any such acts of infringement;

d. declare this case to be exceptional under 35 U.S.C. § 285 and award Plaintiff its attorneys' fees, expenses, and costs incurred in this action;

e. provided discovery reveals that Defendant (1) knew of the Patents-in-Suit before the filing date of the lawsuit; (2) after acquiring that knowledge, infringed the Patents-in-Suit; and (3) in doing so, knew or should have known that its conduct amounted to infringement of the Patents-in-Suit, declare Defendant's infringement to be willful and enhance the damages award pursuant to 35 U.S.C. § 284; and

f. award Plaintiff such other and further relief as this Court deems just and proper.

DATED: May 18, 2026,                          Respectfully submitted,

*/s/ Andre R. Belanger*
Andre R. Belanger (Ga. Bar. No. 216527
**GO BIG INJURY LAW**
1 Glenlake Parkway NE
Suite 650
Sandy Springs, Ga 30328
T: 1-800-777-7777
F: 1-843-494-5536
E: andre.belanger@poulinwilley.com
***Attorneys for VDPP, LLC***

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure, I hereby certify that all counsel of record who have appeared in this case are being served on this day of May 20, 2026, with a copy of the foregoing via ECF filing and/or email.

/s/ Andre R. Belanger
Andre R. Belanger

14